IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 2, 2019 Session

**COY MCKAUGHAN v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 10-00690    James M. Lammey, Judge

_____

**No. W2018-01035-CCA-R3-PC**
_____

The Petitioner, Coy McKaughan, filed a post-conviction petition in the Shelby County Criminal Court seeking relief from his conviction of aggravated sexual battery and accompanying twelve-year sentence in the Tennessee Department of Correction. The post-conviction court denied the petition, and the Petitioner appeals. On appeal, the Petitioner contends that (1) his trial counsel was ineffective, (2) his appellate counsel was ineffective, (3) his due process rights were violated by the State's withholding evidence in violation of Brady v. Maryland, (4) his due process rights were violated by the State's assembling a "rigged grand jury foreperson," (5) the State violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 7 of the Tennessee Constitution, and (6) he was denied his constitutional right to a "full and fair" post-conviction hearing. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. THOMAS T. WOODALL, J., not participating.

Joseph A. Crone, Memphis, Tennessee, for the Appellant, Coy McKaughan.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Gavin Smith, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Petitioner was charged with the aggravated sexual battery of his six-year-old stepdaughter. Specifically, the indictment alleged that on September 3, 2009, the Petitioner unlawfully and intentionally engaged in sexual contact with the victim, who was less than thirteen years of age, in violation of Tennessee Code Annotated section 39-13-504.

At trial, C.M., the victim's mother, testified that the victim was born on November 15, 2002. When the victim was four years old, C.M. and the Petitioner married, and they later had a daughter.

On September 3, 2009, the victim's friend came to their home for a visit. The girls rode bicycles together, and the victim had a bicycle accident that caused injuries to her right side, head, and knee. That night, C.M. drove the victim's friend home. When C.M. returned, the victim and her sister were in bed. C.M. went into her daughters' room and saw the girls lying on a daybed, with one girl on each end of the bed. Both girls fit on the bed because they were "very small." The Petitioner was lying on his side behind the victim, and a blanket was draped across them. C.M. saw the Petitioner's hand moving underneath the blanket, as if he were rubbing the victim between her legs. C.M. asked the Petitioner what he was doing, and the Petitioner "looked at [her] like a deer in headlights." The victim looked terrified. C.M. took both of the children to her bedroom and shortly thereafter, she took the girls to the front yard and called 911. While they were outside, a neighbor drove into his driveway. C.M. said that she did not know what the Petitioner would do if he came out of the house, so she asked the neighbor if he and his wife would watch the children.

C.M. said that when the police arrived, they questioned her and the victim separately. Around 6:30 a.m. the following morning, the victim was examined at the Child Advocacy Center.

C.M. identified the victim's blanket, nightgown, and underwear that were taken by the police. She acknowledged that some "drawings" on the blanket were not present before it was taken by the police.

On cross-examination, C.M. acknowledged that she and the Petitioner had "[s]erious discussions" about the Petitioner adopting the victim. C.M. said that the adoption was the Petitioner's idea, that he wanted the victim to call him "daddy," and that he was the only father the victim had ever known. The Petitioner had not "follow[ed] through" with the adoption.

The victim testified that a few months prior to her seventh birthday, she was living in a house with her mother, her sister, and the Petitioner. She said that the Petitioner gave her a "bad touch," and she pointed toward her vagina. She said that the touching happened in "a bunch of rooms" at their home and that it happened "more than once." The Petitioner

told her not to tell anyone. The victim said that her mother walked into the victim's bedroom during one incident. The victim explained that she was lying on her bed and that the Petitioner came into her room and stood beside the bed. The victim said that she was underneath her princess blanket and that the Petitioner "rubbed [her] in a circular pattern" on top of her underwear. C.M. made the victim go to the neighbor's house across the street.

The victim explained that when she said "this happened a lot of times," she meant "[k]issing." She recalled that a few days before the incident, the Petitioner gave her a "grownup kiss" that was "not a good touch." The victim said that she did not want the Petitioner to kiss her like that or to touch her vagina, but she was afraid to tell him to stop. The victim said that she had told C.M. about the Petitioner's kissing her before C.M. caught the Petitioner touching her. C.M. had told the victim that the Petitioner "would never do that to [her]."

Millington Police Officer Trudie Carter testified that she spoke with the victim at a neighbor's house on the night of the complaint. The victim told Officer Carter

> that she was lying in her bed, and her dad got into her bed with her and got underneath her covers with her; and he started kissing her like he would kiss her mother. . . . And she said, "Well, then he started to touch me," and she lifted up her nightgown and showed me her vaginal area. . . . And she said that he was using his two fingers - she demonstrated he used two fingers - his index finger and his middle finger and moving them around in a circular motion. . . . And she said that he also pulled the skin apart down there. And I asked her if he had done this over her underwear or under; and she said it was over.

Dr. Karen Lakin testified that on September 4, 2009, she examined the victim at the Memphis Child Advocacy Center. During her examination and interview of the victim, Dr. Lakin learned that the victim had been in a bicycle accident. Dr. Lakin saw a healing abrasion on the victim's forehead and her right knee. Dr. Lakin said that the victim

> disclosed in the interview that her step-father was touching her private area ["]on the front["]; and motioned with her index finger a circular pattern.

> She also disclosed that he kissed her ["]like he kisses mama["].

> She disclosed that he told her it was ["]their secret["];
> but she told him it was ["]his and mama's secret["].
>
> The patient did state that [the touching] had happened
> before.

Dr. Lakin said the victim was frightened and "tearful" during the interview. During her examination of the victim, Dr. Lakin noticed irritation and redness on the left side of the victim's genital area. Dr. Lakin explained that the asymmetrical redness was not "something typical that you would see just for no reason at all" and that "it may be from some type of sexual assault, but there are other reasons that you may see it as well." The victim also had an area of abrasion just below the bottom of the hymen. Dr. Lakin took photographs of the injuries, and the photographs were shown to the jury to explain the victim's injuries. The victim weighed thirty-two pounds and was one hundred and eight centimeters tall at the time of the examination.

Claire Prince testified that she was a social worker with the Child Advocacy Center. On September 4, 2009, she interviewed the victim. The victim told Prince that the Petitioner had touched the victim with one finger on the outside of her underwear. The victim said that the incident C.M. saw was the first time the Petitioner had touched her in that manner. The victim mentioned that the Petitioner had stuck his tongue in her mouth.

The parties stipulated that on September 3, 2009, the Millington Police Department collected the victim's pink blanket, her nightgown, and her underwear. The three items were submitted to the Tennessee Bureau of Investigation's (TBI) crime laboratory to be tested for semen or other bodily fluids, but none were found.

Morgan Jones testified for the Petitioner. Jones said that the Petitioner told him on two occasions that he was thinking about divorcing C.M. and resuming a relationship with his ex-wife. Jones said that on the night of September 3, 2009, he was at the Petitioner's house. The Petitioner had been drinking heavily and was "almost passed out" when Jones left.

Bubba Williams testified that for six months prior to the offense, he noticed that the Petitioner and C.M. were having marital problems. The Petitioner told Williams that he was consulting an attorney for advice about whether he should adopt the victim.

Todd Parsons said the Petitioner told him that he was considering leaving C.M. and resuming a relationship with his ex-wife. Parsons was at the Petitioner's residence on the night of September 3, 2009. When Parsons left, the Petitioner was "inebriated."

- 4 -

The Petitioner testified that after he and C.M. married, they began having problems. She became distant, they stopped sleeping in the same bed, and they took turns sleeping on the couch.

The Petitioner said that on the night of the offense, he drank six "big old mugs" of beer. After the guests left and the children had gone to bed, the Petitioner went to the living room, sat on the couch, and turned on the television. The children got out of bed and told him they were hungry or thirsty. The Petitioner went to the children's room, started a movie, and lay down with them so they would go to sleep. The Petitioner denied kissing the victim inappropriately, fondling the victim, or touching the victim between her legs. He said, "I would never do anything remotely close to that."

The Petitioner said that when C.M. came into the children's bedroom and asked what he was doing, she looked angry. The Petitioner was confused. C.M. said, "You know what I'm talking about," and she and the children left the house. The next thing the Petitioner remembered was the police coming to the house. The Petitioner did not know why they were there. The officer asked the Petitioner if he had been in his daughter's bed that night, and the Petitioner answered affirmatively. The Petitioner told the officer that they were watching movies. The officer asked the Petitioner if he kissed his daughters. The Petitioner said that he became angry and told the officer that he had kissed his daughters but not inappropriately.

At the conclusion of the trial, the jury found the Petitioner guilty of aggravated sexual battery, and the trial court imposed a sentence of twelve years at one hundred percent in the Department of Correction. State v. Coy McKaughan, No. W2013-00676-CCA-R3-CD, 2014 WL 2547768, at *1 (Tenn. Crim. App. at Jackson, June 2, 2014). On direct appeal, the Petitioner's sole issue was the admissibility of the video recording of the victim's forensic interview. Id. This court affirmed the judgment of the trial court. Id.

Thereafter, the Petitioner filed a pro se petition for post-conviction relief. Counsel was appointed, but no amended petition was filed. The Petitioner alleged the following claims of ineffective assistance of counsel: (1) that appellate counsel failed to appeal all the issues raised in the Petitioner's motion for new trial; (2) that trial counsel failed to raise an objection pursuant to Rule 404(b) of the Tennessee Rules of Evidence to the introduction of other alleged crimes that occurred outside the time specified in the indictment and that appellate counsel failed to raise the issue on direct appeal; (3) that trial counsel failed to request an election of offenses after the State presented proof of charged and uncharged criminal conduct at trial and that appellate counsel failed to raise the issue on direct appeal; (4) that trial counsel failed to object to the admission of photographs that were taken of the victim during a forensic examination and that appellate counsel failed to raise the issue on direct appeal; (5) that trial counsel gave the Petitioner incorrect legal

- 5 -

advice during the plea negotiation process and that appellate counsel failed to raise the issue on direct appeal; (6) that trial counsel failed to challenge the trial court's infringement of the Petitioner's right to present a defense after the court threatened the Petitioner with aggravated perjury when he attempted to offer proof in support of a Rule 412 motion and that appellate counsel failed to raise the issue on direct appeal; (7) that trial counsel failed to object to the hearsay testimony of three police officers and Dr. Lakin and that appellate counsel failed to raise the issue on direct appeal; (8) that trial counsel failed to ask C.M. about her statement to Bubba Williams that she "need[ed] to find a way to get rid of [the Petitioner]" and that appellate counsel failed to raise the issue on direct appeal; (9) that trial counsel failed to challenge the enhancement and mitigating factors imposed by the trial court during sentencing and that appellate counsel failed to raise the issue on direct appeal; (10) that trial counsel failed to object to multiple acts of prosecutorial misconduct and that appellate counsel failed to raise the issue on direct appeal; (11) that trial counsel failed to challenge the selection process of the grand jury foreperson, which was illegal; (12) that trial counsel failed to object to the introduction of the video recording of the victim's forensic interview as substantive evidence or to request a limiting instruction and that appellate counsel failed to raise the issue on direct appeal; and (13) that trial counsel failed to challenge the unlawful search and seizure of the Petitioner by the Millington Police Department.

The record reflects that the day before the post-conviction hearing, post-conviction counsel told the court that appellate counsel was not available to testify. Post-conviction counsel explained that he thought appellate counsel had moved to North Carolina, and post-conviction counsel had been unable to contact appellate counsel. Post-conviction counsel stated that he would submit "transcripts of the appellate record" which would "speak for itself."

Post-conviction counsel acknowledged that he had not filed an amended petition but stated that the Petitioner wanted to raise an issue regarding the illegal appointment of the foreperson of the grand jury that returned the indictment against him. Post-conviction counsel said that a retired naval commander who was convicted of a felony similar to the Petitioner's conviction had contacted post-conviction counsel about the grand jury issue. The grand jury foreperson in the naval commander's case was chosen by a similar procedure, and post-conviction counsel advised the court that the Petitioner wanted the naval commander to testify at the post-conviction hearing.

Upon questioning by the post-conviction court, post-conviction counsel noted that the Petitioner was convicted in 2012 and that the Petitioner filed the post-conviction petition in 2015. The post-conviction court noted that the post-conviction case had been pending for three years, during which the hearing had been set several times. The post-conviction court refused to delay the hearing to allow the Petitioner to pursue a new issue

regarding the selection of the grand jury foreperson because it was not pursued as a claim of ineffectiveness of trial counsel.

At the beginning of the post-conviction hearing the following day, post-conviction counsel announced that the Petitioner wanted to proceed pro se. The Petitioner said he was not prepared to proceed because his "post conviction center[ed] around delayed appeal," and his appellate counsel was not present to testify. The Petitioner maintained that he knew appellate counsel's North Carolina address. The Petitioner said that trial counsel had raised ten issues in the motion for new trial but that appellate counsel had not raised all of the issues on direct appeal. The Petitioner further said that appellate counsel had never met with him. The post-conviction court advised the Petitioner that he would have to rely on the record, including the written motion for new trial, the transcript of the motion for new trial, and the appellate brief, in support of his contentions. The post-conviction court reiterated it could not order that appellate counsel be brought into court. The Petitioner responded that he was not ready for the hearing. The post-conviction court advised the Petitioner that he could proceed pro se but that the case would be heard that day or it would dismissed with prejudice.

The post-conviction court explained that it could not force appellate counsel, who resided out of state, to return to Tennessee to testify. The post-conviction court further explained that it refused to delay the post-conviction proceedings based upon the hope appellate counsel would return to Tennessee.

The Petitioner then stated that he also wanted to introduce "grand jury reporting orders" for the foreperson of the grand jury that indicted him. The Petitioner maintained that the grand jury foreperson was supposed to serve only a two-year term; however, the foreperson of his grand jury was reappointed "[o]ver and over," which the Petitioner contended rendered his indictment void. The post-conviction court said that the Court of Criminal Appeals had addressed the issue in another case and "determined that does not render it void."

Trial counsel testified that he was appointed to represent the Petitioner. The offense was alleged to have occurred on September 3, 2009, and the State introduced evidence of other acts that might have occurred prior to the date specified in the indictment. Trial counsel acknowledged that if he had not objected to evidence of the other acts, he "probably should have." Trial counsel noted that the indictment alleged a single incident but that the victim testified regarding "other innocuous inappropriate behavior." Trial counsel noted Dr. Lakin had testified that during the forensic interview, the victim said the Petitioner "had kissed her in a way he kissed mommy – in a way that she found to be inappropriate – not okay touching." At trial, the victim testified that the kissing occurred a few days prior to the charged offense. Trial counsel thought that he objected to the testimony about the

kissing and that the trial court ruled that the State could present evidence of the "grooming" that led to the charged offense.

Trial counsel said that he thought the victim's trial testimony went "into areas that we had not been made aware of at any point in time," noting that her testimony was more detailed than her forensic interview. Trial counsel could not recall definitively if he had objected to the victim's testimony about the kissing. Trial counsel said that he would not define the kissing as a sexual assault, but he would define it as "inappropriate behavior." Trial counsel acknowledged that he did not ask for an election of offenses at the close of the State's proof, explaining that the other incidents did not "r[i]se to the same level of the offense charged."

Trial counsel said that prior to trial, he knew the victim's forensic interview was video recorded and recalled that a hearing was held regarding the admissibility of the video at trial. Trial counsel said the State announced "very late in the game before the first trial [date]" that it wanted to introduce the photographs of the victim's vagina which were taken during the forensic examination, and the trial date was continued to allow the defense to prepare for the photographs. Trial counsel said that the photographs "were pretty graphic" and that they "had the possibility to inflame the jury." He could not recall whether he made specific objections to the photographs; however, he did not think the State committed a Brady violation by failing to disclose the photographs earlier in discovery.

Trial counsel recalled that the victim had a bicycle wreck on the day of the offense and that the defense theory was that the victim's injuries could have been caused by the wreck. Trial counsel thought his cross-examination of the victim was "fairly decent." He also thought he thoroughly cross-examined Dr. Lakin and "was able to bring out to Dr. Lakin that there were certainly other reasons for any of these abrasions than what they were alleging against" the Petitioner. Trial counsel said that the Petitioner was convicted because he allegedly touched the victim's vagina.

Trial counsel said that the State made a disclosure "very late in the game" that it intended to introduce the victim's blanket and underwear into evidence. Trial counsel did not think the failure to disclose the blanket and underwear at an earlier time was a Brady violation.[1] Trial counsel explained that the prosecutor told trial counsel that she was not sure whether the State was aware that the victim's blanket and her underwear "existed until the time [they] were produced just prior to trial." The prosecutor told trial counsel that the items were tested for DNA but that no DNA was discovered. Trial counsel acknowledged

---

[1] Post-conviction counsel requested permission to supplement the record with the Millington police report to show the police did not have the victim's blanket or her underwear at the time of the Petitioner's arrest. However, the record does not reflect that the record was supplemented with such a report.

that "any testing that doesn't bring a conclusion that assists the state with its burden of proof is certainly favorable to the defense."

Trial counsel said that during direct examination, he asked the Petitioner if the victim had any prior knowledge of sexual events. Trial counsel was "[v]ery suspicious" of the victim's "very anatomically correct" description of how the vaginal redness occurred, and he wanted to establish how the victim became familiar with "certain language – certain body parts." Trial counsel said that the defense wanted to introduce evidence through a Rule 412 motion to support the defense theory that the victim "had been coached" and to explain how the victim was "able to make the description that she made."[2] The defense ultimately did not pursue a Rule 412 hearing because "there was a discussion of, you know, whether statements that would be made during that hearing could eventually lead to some sort of additional aggravated perjury or perjury charges."

Trial counsel said that C.M. was a very "sympathetic" witness, especially testimony "about how her life had been affected by the breadwinner in the family, not being able to work, and then having to move and go on welfare." Trial counsel said that during cross-examination, he failed to ask C.M. about statements she had allegedly made to Bubba

---

[2] Tennessee Rule of Evidence 412(b) provides that in certain situations when a defendant is charged with a sexual offense, the "[r]eputation or opinion evidence of the sexual behavior of an alleged victim of such offense is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule and required by the Tennessee or United States Constitution." Specifically,

> Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
> (1) Required by the Tennessee or United States Constitution, or
> (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
> (3) If the sexual behavior was with the accused, on the issue of consent, or
> (4) If the sexual behavior was with persons other than the accused,
> (i) to rebut or explain scientific or medical evidence, or
> (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
> (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c).

Williams that she was "out to get [the Petitioner]." As a result, trial counsel was unable to call Bubba Williams to impeach C.M.'s testimony and show that she "coached" the victim.

Trial counsel recalled that the victim's blanket was used for demonstrative purposes during trial. Trial counsel said that he did not object to the introduction of the blanket, noting that "we had the stipulation in place . . . [a]nd one of the things that I wanted to argue was that the stipulation was in our favor." Trial counsel noted that the laboratory that had done the testing had drawn small dark circles on the blanket. Trial counsel did not recall if the reason for the circles was explained to the jury.

Trial counsel said that he did not make any objections regarding the foreperson of the grand jury. Regarding a motion to suppress, trial counsel said that he did not recall "seeing anything that was of concern to suppress." Trial counsel noted that the Petitioner received the warrant for his arrest more than a month after his arrest, but trial counsel did not challenge the validity of the Petitioner's arrest.

Trial counsel said that he filed a motion for new trial and one or two amendments to the motion because he felt "there were multiple issues that occurred at trial that needed to be brought up on appeal." Trial counsel "was a bit stunned" that appellate counsel did not raise more issues on appeal. Trial counsel acknowledged that generally the strategy on appeal was not to raise any grounds that might impact the defense's credibility, but otherwise, to argue as many issues as possible because predicting which issues the appellate court might grant relief on was difficult. Trial counsel was taught to always raise sufficiency and sentencing issues on appeal. Trial counsel said that the "one thing [appellate counsel] did argue was fairly well settled, albeit new but well-settled law." Trial counsel said that he made himself available to appellate counsel if he had any questions about the issues in the motion for new trial but that appellate counsel never contacted him. Trial counsel thought he spoke with appellate counsel shortly before appellate counsel moved out of state.

Trial counsel said that he and the Petitioner discussed whether the Petitioner should accept a plea offer. Trial counsel told the Petitioner that if he pled guilty to a sexual offense, he would be subject to community supervision for life and placed on the sexual offender registry. Trial counsel said that the Petitioner "was adamantly against being on community supervision and on the registry."

On cross-examination, trial counsel said Dr. Lakin testified at trial that the victim's injuries were consistent with the victim's version of events; however, Dr. Lakin could not say conclusively that the injuries were caused by abuse. Trial counsel extensively cross-examined Dr. Lakin on whether the injuries could have been caused by other means, and she agreed the injuries could have been caused by something other than sexual abuse. Dr.

- 10 -

Lakin said that the victim described the Petitioner's making a "circular motion" when committing the offense, and Dr. Lakin used the photographs taken of the victim during the forensic examination "to describe sort of the unique pattern that matched what the victim had described happened."

Trial counsel acknowledged that often appeals challenging the sufficiency of the evidence were not successful. Trial counsel opined that successful challenges to the sufficiency of the evidence usually involved the State's failure to prove the element of intent. In the Petitioner's case, intent was not an issue; instead, the issue was whether the acts happened or whether the Petitioner was the person who committed the acts.

Trial counsel agreed that in the motion for new trial, he raised an issue regarding whether the trial court erred by "limiting questions of the defense witness, Bubba Williams." Nevertheless, trial counsel conceded that "there's no doubt that the initial error falls on me for not asking [C.M.] the proper question[s]" to lay the foundation for asking Williams about the impeachment evidence.

Trial counsel said that he had made a Rule 412 motion so that witnesses could testify regarding the victim's prior exposure to sexual acts or sexual "situations." On the day of the hearing, the witnesses who were supposed to testify in support of the motion were uncooperative and refused to testify on the Petitioner's behalf. Trial counsel acknowledged that the witnesses had no reason to testify that they had committed sexual acts against the victim. Moreover, if the witnesses had testified that they did not do anything to the victim, counsel would have had to accept it. Accordingly, counsel and the Petitioner decided not to proceed with the motion and instead asked to make an offer of proof. Trial counsel explained that "in what was a back and forth between [the trial court and the Petitioner], concerns were raised about, you know, these people are denying it, if you come on and this is proven to be a false statement then you have made, then you would be committing perjury." Trial counsel agreed that in the motion for new trial, he raised an issue regarding whether the "trial court erred in not allowing, under threat of perjury, the [Petitioner] to make an offer of proof regarding (indiscernible), motion for 412 evidence."

Trial counsel agreed that he also raised an issue regarding whether the trial court erred by allowing the State to lead the victim on direct examination. Trial counsel conceded that it was not unusual for a court to give the State "latitude" in questioning a child victim. Trial counsel had been concerned that the victim was "just parroting" what the State said; he acknowledged, however, that her testimony was consistent with her forensic interview.

Trial counsel acknowledged that he raised a Rule 404(b) objection to the admission of other acts such as the Petitioner's kissing the victim but that the trial court ruled the acts

were admissible as "grooming behaviors." Nevertheless, trial counsel raised the issue again in the motion for new trial. Trial counsel said that he did not see the need for an election of offenses because he thought the indictment was clear regarding the offense on which the State was relying to convict the Petitioner. Trial counsel said that he never found any support for the argument that the selection of the grand jury foreperson was improper.

Bubba Williams testified that he and the Petitioner were close friends and that they had known each other for twenty years. Williams went to the Petitioner's house every other week or every three or four weeks. Williams said that he was at the Petitioner's trial and was available to testify, but he was never called.

Williams said that approximately four weeks prior to the Petitioner's arrest, he was at the Petitioner's house. The Petitioner and C.M. were arguing about the victim's adoption. The week following the argument, C.M. called Williams, which was "out of the ordinary." C.M. asked Williams to "go and buy her a porno book." Williams asked why she wanted the book, and C.M. responded that it was for her "personal use." Williams called the Petitioner and told him about the request. The Petitioner told Williams to get the book and that he would ask C.M. about it later. Williams obtained the book for C.M.

Williams said that the next time he visited the Petitioner's house, the Petitioner and C.M. again argued about the victim's adoption. The Petitioner told C.M. that he wanted to discuss the matter with an attorney. When the Petitioner left the room, C.M. said, "'I'm getting rid of him, whatever it takes.'" Williams said that C.M. was upset because the Petitioner would not adopt the victim. The Petitioner later told Williams that his attorney had advised him against adopting the victim because if he and C.M. ever divorced, the Petitioner would be required to pay child support.

Williams recalled that the Petitioner was arrested the following week. C.M. called Williams to tell him about the arrest. Williams asked for details, and C.M. told Williams that the Petitioner had been arrested for "[f]ondling" the victim. C.M. explained that she and the Petitioner "would swap nights on putting [the] kids to bed. He would lay in the bed with them one night and put them to sleep, and [she] would lay in the bed with them the other night and put them to sleep.'" C.M. said that she had seen the "covers moving," but both the victim and the Petitioner were dressed. Williams told her that the Petitioner could have been scratching his leg.

Williams said that the Petitioner called him from jail and asked him to go to the bank and withdraw money from the Petitioner's pension plan so the Petitioner could hire an attorney. Williams called the bank and was told that the Petitioner was too young to withdraw the money from the pension plan. The bank also said that C.M. had already tried to withdraw money from the Petitioner's pension plan.

On cross-examination, Williams said that prior to trial, he gave a statement to the defense investigator. Williams said that his post-conviction testimony may have contained information he did not tell the defense investigator. He explained that he did not remember going to the bank to try to get the Petitioner's money until after he had spoken with the investigator. Williams also did not tell the investigator about buying the "porno book" for C.M. Williams told trial counsel about the book, but trial counsel told Williams that it "wouldn't matter," that it "wouldn't be admissible," and that "he [did not] know if they would even look at that or not." Williams acknowledged that he told the investigator that C.M. called him a couple of times when she was looking for the Petitioner.

Williams acknowledged he told the investigator that when C.M. said she would get rid of the Petitioner, Williams thought she was just upset about the Petitioner's reluctance to adopt the victim. Williams further acknowledged that he did not tell the investigator that C.M. said she and the Petitioner took turns putting the children to bed.

Williams said that C.M. usually "acted like a good Christian person" but that in the weeks prior to the Petitioner's arrest, she began acting differently. Williams did not know if the change in her behavior could be attributed to her marital problems.

Upon questioning by the post-conviction court, Williams said that he thought the Petitioner and C.M. were still married at the time of the post-conviction hearing, but he did not know how long they had been married. Williams could not recall if he had spoken with trial counsel before or after he spoke with the defense investigator.

Williams said that the Petitioner was in jail for three and one-half years before trial. He recalled that the State "actually had a plea bargain for him, I believe, but he thought everything would be okay, I guess; and, you know, he stayed here waiting to wait on a trial." Williams acknowledged that he did not tell the police that the Petitioner was innocent.

The Petitioner testified that he was convicted of aggravated sexual battery that allegedly occurred on September 3, 2009. The Petitioner said that on September 3, he and C.M. invited some friends to their house and that the children were at home. The Petitioner and C.M. drank alcohol that night.

Regarding his claims of ineffective assistance, the Petitioner contended that trial counsel should have requested an election of offenses because the State presented evidence of uncharged offenses. The Petitioner maintained that at trial, the victim's testimony was confusing as to whether on prior occasions the Petitioner had merely kissed her or had also touched her.

The Petitioner said that he allegedly touched the victim on top of her underwear; however, the State introduced photographs showing "redness" on the victim's vagina. The Petitioner contended that the redness could have been caused by the victim's bicycle accident that day.

The Petitioner contended that trial counsel gave him incorrect legal advice during plea negotiations. The Petitioner said that when trial counsel told him about the State's offer, trial counsel said that the discovery was complete. The Petitioner said that at the "plea deadline hearing" in November 2011, he was "told by . . . [the j]udge . . . that from this day forward there would be no more plea deals." The Petitioner asked for trial counsel's advice, and trial counsel responded that he did not think the State had any evidence and that he thought the Petitioner "st[oo]d a good chance." Trial counsel said that the Petitioner had to decide whether to plead guilty or proceed to trial. The Petitioner made the decision to go to trial based on the information he received from trial counsel. The Petitioner said that by the time of trial, the State had photographs of the injuries to the victim's vagina.

The Petitioner acknowledged that trial counsel first learned of the photographs immediately prior to a pretrial hearing. Trial counsel filed a motion in limine to exclude the photographs, and the trial court ruled against the Petitioner. The Petitioner said that he and trial counsel had prepared for trial with no knowledge of the photographs. The Petitioner thought trial counsel should have asked the trial court to allow further plea negotiations after the photographs were disclosed.

The Petitioner said that if he had known he would be subject to community supervision for life, he "probably" would have pled guilty. The Petitioner explained, "[A]t that time, community supervision wasn't – as a Class-C misdemeanor in criminal attempt, I wouldn't be required to be placed under community supervision. And [trial counsel] never explained that to me." Post-conviction counsel asked the Petitioner if he would have chosen to plead guilty if he had known about the photographs. The Petitioner responded, "I mean, I really can't answer that question. I mean, I may and I may not have – probably more than not would have . . . . I probably would have – hindsight, I would have taken the plea deal."

The Petitioner acknowledged that trial counsel pointed out to the jury that the photographs were not mentioned in the forensic examination report and that a box on the report was not checked to reflect that photographs had been taken. The Petitioner also complained about the late disclosure of the victim's blanket, her nightgown, and her underwear. The Petitioner contended that trial counsel's cross-examination of Dr. Lakin

- 14 -

was inadequate and that trial counsel should have objected to Dr. Lakin's testimony and report.

The Petitioner explained that as part of his defense, he wanted to show the victim's "sexual knowledge because she was so vivid and graphic about things." The Petitioner said that prior to trial, he informed the trial court that he wanted his nieces and nephews to testify about an incident in which the victim was caught in a closet with his nephew, but when his nieces and nephews came to court, "they said that they weren't going to testify. And I don't know if they said it wasn't true or whatever." The Petitioner contended the trial court told him that "'[i]f you get up there and say anything, I'm going to get you with aggravated perjury.'" The post-conviction court responded that it did not remember making such a statement but acknowledged that it had known "in the past, where defendants would get on the stand during pretrial motions and lie; and they would be indicted for aggravated perjury for lying on a pretrial motion." The post-conviction court stated, "It didn't help [the Petitioner's] cause by saying something that would be contrary to what other witnesses would say; because on a pretrial motion, or something like that, if you're found to be lying, then you could be charged with aggravated perjury." The Petitioner said that he was prejudiced by the trial court's threat of a perjury charge.

The Petitioner contended that trial counsel's cross-examination of C.M. was incomplete and that the failure to ask certain questions of C.M. prevented trial counsel from being able to call Bubba Williams as a defense witness.

The Petitioner said that he asked trial counsel to challenge the process of selecting the grand jury foreperson. The Petitioner said that in his petition, he also raised the selection of the grand jury foreperson "as a stand-alone issue under due process." The post-conviction court responded that it would not allow the Petitioner to pursue that issue, noting that trial counsel was not appointed until after the Petitioner was indicted.

At the conclusion of the hearing, the post-conviction court held that the Petitioner failed to prove that he received the ineffective assistance of trial counsel or appellate counsel. On appeal, the Petitioner challenges this ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). The same test is used to determine the effectiveness of trial counsel and appellate counsel. See Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

This court has previously observed:

> "[F]ailure to preserve and/or assert all arguable issues on appeal is not *per se* ineffective assistance of [appellate] counsel, since the failure to do so may be a part of the counsel's

- 16 -

strategy of defense. Counsel is not constitutionally required to argue every issue on appeal, or present issues chosen by his client. The determination of which issues to present on appeal is a matter of counsel's discretion."

State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Moreover, "[a]ppellate counsel [is] not constitutionally required to raise every conceivable issue on appeal." Carpenter, 126 S.W.3d at 887. "[T]he determination of which issues to raise on appeal can be characterized as tactical or strategic[ ] choices, which . . . should not be 'second guessed' on appeal, subject, of course, to the requisite professional standards." Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

Our supreme court has set forth the following "non-exhaustive list" of factors which "is useful in determining whether an attorney on direct appeal performed reasonably competently in a case in which counsel has failed to raise an issue":

> 1) Were the omitted issues "significant and obvious"?
> 2) Was there arguably contrary authority on the omitted issues?
> 3) Were the omitted issues clearly stronger than those presented?
> 4) Were the omitted issues objected to at trial?
> 5) Were the trial court's rulings subject to deference on appeal?
> 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> 7) What was appellate counsel's level of experience and expertise?
> 8) Did the petitioner and appellate counsel meet and go over possible issues?
> 9) Is there evidence that counsel reviewed all the facts?
> 10) Were the omitted issues dealt with in other assignments of error?
> 11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Carpenter, 126 S.W.3d at 888.

A. Full and Fair Hearing

Generally, "[r]elief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. "'Due process is flexible and calls for such procedural protections as the particular situation demands.'" Seals v. State, 23 S.W.3d 272, 277 (Tenn. 2000) (quoting Phillips v. State Bd. of Regents, 863 S.W.2d 45, 50 (Tenn. 1993)). "The flexible nature of procedural due process requires an imprecise definition because due process embodies the concept of fundamental fairness." Id. "All that due process requires in the post-conviction setting is that the defendant have the opportunity to be heard at a meaningful time and in a meaningful manner." Stokes v. State, 146 S.W.3d 56, 61 (Tenn. 2004) (internal quotation marks and citations omitted). In a post-conviction proceeding, the requirement of a "'full and fair hearing'" is fulfilled when a "'petitioner is given the opportunity to present proof and argument on the petition for post-conviction relief.'" Brimmer v. State, 29 S.W.3d 497, 531 (Tenn. Crim. App. 1998) (House v. State, 911 S.W.2d 705, 714 (Tenn. 1995)). The determination of whether the prospective evidence is relevant is left to the post-conviction court's discretion, which this court will not overturn without a showing of abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995)). At the hearing, the "[p]roof upon the [P]etitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition." Tenn. Code Ann. § 40-30-110(c).

## 1. Continuance

First, we will address the Petitioner's contention that he was denied a "full and fair" post-conviction hearing after the post-conviction court refused to grant a continuance so that he could secure the attendance of appellate counsel, against whom the Petitioner raised allegations of ineffective assistance of counsel. The decision whether to grant a continuance rests within the sound discretion of the trial court. See State v. Mann, 959 S.W.2d 503, 524 (Tenn. 1997). A post-conviction hearing "shall not be continued except by order of the court finding that unforeseeable circumstances render a continuance a manifest necessity." Tenn. Sup.Ct. R. 28, § 8(B). The trial court's decision may be reversed only if the trial court abused its discretion and the Petitioner was improperly prejudiced. See State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). A Petitioner is improperly prejudiced by the denial of a motion for continuance when "a different result might reasonably have been reached if the continuance had been granted." Id. A criminal defendant's constitutional right to compulsory process to obtain witnesses in their favor is not unlimited and "extends to 'competent, material, and resident witnesses whose expected testimony will be admissible.'" William Darryn Busby v. State, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, at *8 (Tenn. Crim. App. at Nashville, Oct. 30, 2013) (quoting Bacon v. State, 385 S.W.2d 107, 109 (Tenn. 1964)); see Paul Graham

<u>Manning v. State</u>, No. M2005-02876-CCA-R3-PC, 2007 WL 4116487, at *12 (Tenn. Crim. App. at Nashville, Nov. 13, 2007).

The record reflects that despite repeated continuances, the Petitioner waited until the day before the post-conviction hearing to complain about his inability to secure the attendance of appellate counsel, who was an out-of-state resident. Neither the Petitioner nor post-conviction counsel requested that a subpoena be issued for appellate counsel. Regardless, the post-conviction court correctly stated that it did not have the authority to issue a subpoena to force appellate counsel to testify at a post-conviction hearing. <u>See</u> Tenn. Code Ann. § 40-17-204 (providing subpoena power to compel a non-resident witness to testify in front of a grand jury or at a criminal proceeding). The Petitioner has failed to establish that granting yet another continuance would have benefitted the Petitioner.

## 2. Search and Seizure

Next, the Petitioner maintains that the post-conviction court deprived him of the ability to have a full and fair hearing by not allowing him to present proof that trial counsel was ineffective by failing to challenge the Petitioner's "unlawful search, seizure, and illegal detainment by the Millington Police Department." The Petitioner contends that the police officers entered his home without a search warrant, questioned him without advising him of his <u>Miranda</u> rights, and detained him for over forty-eight hours before he received a probable cause determination by a magistrate.

In his post-conviction petition, the Petitioner contended that trial counsel should have challenged his arrest, maintaining that the police entered his residence without probable cause, without his consent, and without a warrant. At the post-conviction hearing, trial counsel testified that he saw nothing in the Petitioner's case that merited suppression. The post-conviction court noted that the Petitioner did not make "a statement of admission" that was used against him at trial.

Generally,

> [t]he applicable evidentiary rule requires appellants who challenge rulings that exclude evidence to make an offer of proof unless the substance of the evidence is otherwise apparent. On appeal, an appellate court may not find that the exclusion of evidence was error unless a party's substantial right was affected and an offer of proof is contained in the record. Tenn. R. Evid. 103(a)(2). An appellate court may find error where no offer was made if the substance of the evidence and the specific evidentiary basis for admission are apparent

- 19 -

from the record. Id. Consequently, though not explicitly stated, it is apparent that courts are required, in appropriate circumstances, to allow offers of proof when evidence is excluded so as to enable consideration of the issue on appeal.

Alley v. State, 882 S.W.2d 810, 815-16 (Tenn. Crim. App. 1994).

The trial transcript reflects that Millington Police Officer Timothy Ryan Russell testified that C.M. gave the officers permission to enter the house in which she lived with the Petitioner. Our supreme court has held that "'[t]he consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared.'" State v. Stanfield, 554 S.W.3d 1, 13 (Tenn. 2018) (quoting State v. Bartram, 925 S.W.2d 227, 230-31 (Tenn. 1996)). Specifically, "[a] wife can consent to the search of her home, and if objects are found [that] would incriminate her husband, such objects are admissible in evidence." Id. (internal quotation marks and citations omitted). The Petitioner did not call any witnesses or offer any evidence at the post-conviction hearing to show that the search was illegal. Accordingly, the Petitioner has failed to show that he was prejudiced. The Petitioner is not entitled to relief on this issue.

Regarding the Petitioner's complaint that he was not advised of his Miranda rights, we note that generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). As our supreme court has explained:

> In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g.,

Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); State v. Dailey, 273 S.W.3d 94, 102-03 (Tenn. 2009).

In the instant case, the record reflects that the Petitioner was sitting on the couch in his home when he spoke with the police and gave the non-inculpatory statement that was used at trial. The Petitioner testified at trial that at the time he spoke with the police, he did not think the police had an arrest warrant or probable cause to arrest him. The Petitioner has not shown that he was subjected to custodial interrogation requiring the police to advise him of his Miranda rights. See State v. Eric Foster, No. E2018-01205-CCA-R3-CD, 2019 WL 1546996, at *14 (Tenn. Crim. App. at Knoxville, Apr. 9, 2019).

Regarding the Petitioner's claim that trial counsel was ineffective by failing to challenge the State's delay in seeking a probable cause determination after his arrest, we note that "[w]hen a person is arrested without a warrant, the law requires the arresting authorities to take him or her before a magistrate to 'seek a prompt judicial determination of probable cause.'" State v. Bishop, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting Gerstein v. Pugh, 420 U.S. 103, 125 (1975)). In the event of a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual. State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000). In Tennessee, these hearings are often referred to as "'Gerstein hearings.'" Bishop, 431 S.W.3d at 42. Initially, we note that the Petitioner presented no proof that he suffered a Gerstein violation. Moreover, the Petitioner did not establish any connection between his detention and the evidence adduced at trial; therefore, the Petitioner failed to establish a Fourth Amendment violation. See State v. Clayton, 535 S.W.3d 829, 849 (Tenn. 2017).

Additionally, the Petitioner summarily raised the suppression issue as a "stand-alone" claim. However, because the Petitioner failed to support this claim with any argument, this claim is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## B. Rule 404(b)

The Petitioner contends that trial counsel was ineffective because he failed to raise an objection pursuant to Tennessee Rule of Evidence 404(b) when the State adduced proof of other alleged sexual crimes that occurred outside the date specified in the indictment. We note that at trial, the victim clarified that the Petitioner had touched her sexually on one occasion and that on another occasion he had given her a "grownup" kiss. Trial counsel testified that he thought he objected to the testimony about the kissing and that the trial court ruled the State could present evidence of the "grooming" that led to the charged offense. The post-conviction court noted that trial counsel testified that the kiss was "'other innocuous inappropriate behavior'" and that the indictment alleged a single incident of

fondling. Further, trial counsel emphasized to the jury that the Petitioner's kissing was not inappropriate and that the Petitioner never touched her inappropriately. Therefore, the record reflects that trial counsel did object to the testimony regarding other acts but that the objection was overruled.

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise a 404(b) issue on direct appeal. The Petitioner failed to support this claim with any argument; therefore, this claim is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## C. Election of Offenses

The Petitioner contends that trial counsel was ineffective by failing to request an election of offenses after the State adduced proof of other uncharged sexual conduct, namely the Petitioner's kissing the victim. The post-conviction court stated that if the State had adduced proof of any additional incidents of digital penetration, the State would have been required to make an election of offenses; however, "here there wasn't anything to elect. The only allegation of actual sexual misconduct was on the day in question." The post-conviction court noted that the indictment clearly charged the Petitioner with engaging in sexual contact with the victim on September 3, 2009. The post-conviction court asserted that any motion for an election of offenses would have been frivolous.

Trial counsel testified that he did not request an election of offenses because he did not think it was warranted. Generally, the State must make an election of offenses when it "adduces proof of multiple instances of conduct that each match the allegation contained in a single charged count." State v. Smith, 492 S.W.3d 224, 232-33 (Tenn. 2016). The Petitioner was charged with aggravated sexual battery, which is unlawful sexual contact with the victim by the defendant when the victim was less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). Tennessee Code Annotated section 39-13-501(6) defines sexual contact as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" "Intimate parts" include "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2). Thus, kissing cannot be construed as an act of aggravated sexual battery. Moreover, the indictment specified that the aggravated sexual battery occurred on September 3, and the victim testified that the kissing occurred prior to that date. See generally State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). The State repeatedly mentioned the date of the offense and, during closing argument, emphasized that the charges related to the allegations of fondling the victim underneath the blanket. Therefore, no election of offenses was necessary. We agree that trial counsel was not deficient for failing to ask for an election of offenses.

- 22 -

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise an issue regarding the election of offenses on direct appeal. The Petitioner failed to support this claim with any argument, thereby waiving this claim. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## D. Admission of Photographs

The Petitioner contends that trial counsel was ineffective by failing to object to the admission of the photographs taken during the victim's forensic examination. However, the record reveals that trial counsel did object to the untimely disclosure of the photographs and filed a motion in limine to prohibit their admission at trial. Trial counsel again raised the objection at trial, but the trial court overruled the objection.

The Petitioner contends that the photographs were "unnecessary and prejudicial." The post-conviction court held that the photographs were "extremely relevant to the prosecution's case to corroborate the victim's testimony and prove that the victim was indeed sexually assaulted." The post-conviction court further held that the probative value of the photographs substantially outweighed the danger of unfair prejudice. Additionally, the post-conviction court noted that trial counsel filed a motion in limine to exclude the photographs. Therefore, the post-conviction court determined trial court was not deficient and that the Petitioner was not entitled to relief on this issue. We agree. The photographs were used at trial to demonstrate why Dr. Lakin reached her conclusions regarding the victim's injuries. This court has held that a trial court may admit photographs of a child's genital area to assist a medical professional's testimony regarding a victim's injuries. See State v. John Valentine, No. W2013-01002-CCA-R3-CD, 2014 WL 4792801, at *7-8 (Tenn. Crim. App. at Jackson, Sept. 25, 2014); see also State v. Wayne Sellers, No. W2013-02771-CCA-R3-CD, 2014 WL 6491070, at *6-7 (Tenn. Crim. App. at Jackson, Nov. 20, 2014). We conclude that the Petitioner has failed to show that trial counsel was ineffective on this issue.

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise an issue regarding the photographs on direct appeal and summarily raises this issue as a "stand-alone" claim. However, because the Petitioner failed to support these claims with any argument, these claims are waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## E. Plea Negotiations

The Petitioner contends that trial counsel was ineffective because he failed to advise Petitioner correctly during plea negotiations. The Petitioner maintains that he rejected the

State's plea offer because trial counsel informed him that the State's discovery was complete. However, just prior to trial, the State produced a photograph of the victim's vagina that was taken during her forensic examination and also submitted as exhibits the victim's blanket, her underwear, and her nightgown which had been tested for DNA. The Petitioner also contends that trial counsel failed to advise him that he would be subject to the sexual offender registry and lifetime supervision if he were convicted of the charged offense at trial.

The post-conviction court noted that the Petitioner rejected the State's plea offer after trial counsel told him discovery was complete and advised him of their chances of winning at trial. The post-conviction court found that trial counsel's advice at the time of the first plea offer was accurate. The post-conviction court stated that after the Petitioner rejected the plea offer, the trial court stated that it would not "accept any further negotiated pleas." The post-conviction court observed that "[t]he nurse clinician had not indicated on her records that photographs were taken [and] the State did not have the evidence either at the time the offer was conveyed and discovered it just before trial." The post-conviction court found that trial counsel was not deficient during the plea negotiation process.

A petitioner who alleges he rejected a plea offer due to the ineffective assistance of counsel

> has the burden to show by a reasonable probability that, but for counsel's deficient representation, (1) he . . . would have accepted the plea, (2) the prosecution would not have withdrawn the offer, and (3) the trial court would have accepted the terms of the offer, such that the penalty under its terms would have been less severe that the penalty actually imposed.

Nesbit v. State, 452 S.W.3d 779, 800-01 (Tenn. 2014) (citing Lafler v. Cooper, 132 S. Ct. 1376, 1385 (2012)).

In the instant case, the Petitioner has failed to meet this burden. Initially, the State notes that the Petitioner failed to establish the exact terms of the plea offer. According to the appellate record, immediately prior to trial the State told the trial court that the State had made an offer that included a plea to "criminal attempt, six years." During the post-conviction hearing, the State explained that the plea offer had been "criminal-attempt aggravated sexual battery, six years, Range I thirty percent, the ability to ask for probation." However, the Petitioner testified that the offer was for a plea to attempted sexual battery and a six-year sentence to be served on probation. The Petitioner said that the conviction

- 24 -

was to be either a "class C felony" or a "class C misdemeanor" with release eligibility after serving thirty percent of the sentence.

Tennessee Code Annotated section 39-13-504(b) provides that aggravated sexual battery is a Class B felony. Tennessee Code Annotated section 39-13-505(c) provides that sexual battery is a Class E felony. Tennessee Code Annotated section 39-12-107(a) provides that "[c]riminal attempt is an offense one (1) classification lower than the most serious crime attempted, unless the offense attempted was a Class C misdemeanor, in which case the attempt would not be an offense." Therefore, attempted aggravated sexual battery is a Class C felony and attempted sexual battery is a Class A misdemeanor. A Range I offender convicted of a Class C felony is subject to a sentence range of three to six years. Tenn. Code Ann. § 40-35-112(a)(3). The sentence for a Class A misdemeanor is no more than eleven months and twenty-nine days. Tenn. Code Ann. § 40-35-111(e)(1). Thus, it seems clear from the record that the plea offer was for attempted aggravated sexual battery, a Class C felony, and a six-year sentence.

The Petitioner also claims that trial counsel advised him prior to the plea hearing that the State's evidence against him was weak and that he had a "good chance" at trial. The Petitioner acknowledges, however, that counsel's advice was given before the State produced the photograph, the victim's underwear, her nightgown, and her blanket as exhibits. We note that at the time of the plea hearing, trial counsel's advice was reasonable and was based upon the evidence available to trial counsel at the time. See Charles Glen Connor v. State, No. M2017-01003-CCA-R3-PC, 2018 WL 4676353, at *7 (Tenn. Crim. App. at Nashville, Sept. 27, 2018), perm. to appeal denied, (Tenn. Feb. 20, 2019).

Moreover, the Petitioner never affirmatively testified that he would have accepted the plea offer. Indeed, his testimony on this matter was, at best, equivocal; the Petitioner said that he "probably" would have accepted the plea or that he "may" or "may not have" accepted the plea. See Joseph Lamont Johnson, Jr. v. State, No. M2012-02310-CCA-R3-PC, 2014 WL 793636, at *9 (Tenn. Crim. App. at Nashville, Feb. 27, 2014) ("[T]he petitioner's own testimony on the issue was equivocal, as he testified at times that he would have taken the offer and at other times that it was 'highly likely' or 'possible' that he would have."). Accordingly, the Petitioner failed to establish that he is entitled to relief on this issue.

Further, the Petitioner complains in his brief that trial counsel failed to advise him that he would be subject to community supervision for life if convicted of aggravated sexual battery at trial and that he would not be subject to community supervision for life if he accepted the plea offer. The Petitioner failed to provide citations to the record to show any testimony in this regard at the post-conviction hearing and failed to support his

argument with citations to authority. This issue is waived. See State v. Bonds, 502 S.W.3d 118, 144 (Tenn. Crim. App. 2016).

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise on direct appeal an issue regarding trial counsel's advice during the plea process. As we concluded *supra*, trial counsel was not ineffective. Moreover, this court has said:

> [T]he practice of raising ineffective assistance of counsel claims on direct appeal is "fraught with peril" since it "is virtually impossible to demonstrate prejudice as required" without an evidentiary hearing. Instead, "ineffective assistance of counsel claims should normally be raised by petition for post-conviction relief."

State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001) (citations omitted). The Petitioner is not entitled to relief.

## F. Right to Present a Defense

The Petitioner contends that trial counsel was ineffective by failing to challenge the trial court's infringement of the "Petitioner's constitutional right to present a defense." The Petitioner maintains that when the Petitioner tried to make an offer of proof in support of his Rule 412 motion, the trial court threatened to charge him with aggravated perjury.

The record belies the Petitioner's contention. The trial transcript reveals that trial counsel stated that in order to explain how the victim could have obtained knowledge of sexual matters, he wanted the victim's aunt and cousin to testify that the cousin and the victim watched a pornographic video together. However, at the time of trial, the victim, her aunt, and her cousin denied the allegations. Trial counsel said that the Petitioner had told him that the victim's grandmother had seen the victim and her cousin watching the video; however, trial counsel acknowledged that the grandmother was not present to testify. Trial counsel told the trial court that he learned from the Petitioner that "the grandmother is who observed [the video watching incident] and then [the grandmother] told the, I guess, aunt, who told [C.M.]." The Petitioner wanted to make an offer of proof. The trial court cautioned the Petitioner that if he testified untruthfully about an event, and the other parties to the event denied that it occurred, he possibly could be subject to perjury charges. The trial court said, "So, I don't know if it would be advisable. If he wants to take the stand, he can come on up. And if he wants to come up and testify to this to establish a record, come on up." The trial court additionally stated that the multiple layers of hearsay might

make the Petitioner's potential testimony inadmissible. Trial counsel did not call the Petitioner to make an offer of proof after the trial court's warning.

At the post-conviction hearing, the Petitioner did not introduce testimony from the victim's aunt or cousin to reflect they would have been willing to testify at trial. Further, the Petitioner did not specify what his offer of proof would have been nor did the Petitioner explain how any exceptions to hearsay applied to make the evidence admissible. Hearsay, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is generally inadmissible except ask provided by the Tennessee Rules of Evidence. Tenn. R. Evid. 801(c), 802. Further, in order to admit "hearsay within hearsay," each part of the combined statements must conform with an exception to the hearsay rule. Tenn. R. Evid. 805. The Petitioner has failed to establish that trial counsel was ineffective in this regard.

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise the foregoing issue on direct appeal. However, the Petitioner failed to support this claim with any argument; therefore, this claim is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

### G. Hearsay

The Petitioner summarily contends that trial counsel was ineffective by failing to object to the hearsay testimony of three police officers and Dr. Lakin, who testified that the victim said the Petitioner touched her vaginal area. The Petitioner also summarily contends that appellate counsel was ineffective by failing to raise this issue on direct appeal. However, the Petitioner makes no argument and cites no law in support of these contentions; therefore, these issues are waived. Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7).

### H. Cross-Examination of C.M.

The Petitioner contends that trial counsel was ineffective by failing to cross-examine C.M. about a statement she made to Bubba Williams about getting rid of the Petitioner, which in turn prevented trial counsel from asking Williams about the statement.

In the instant case, the post-conviction court found that trial counsel was deficient when he failed to sufficiently cross-examine C.M. Nevertheless, the post-conviction court found that Williams testimony at the post-conviction hearing was not credible, noting it was "peculiar" that Williams waited years while his good friend was in jail before revealing that C.M. had made the incriminating statement. The post-conviction court also found that C.M. had no motive to coach the victim to make the accusations, noting that she had

testified that the Petitioner had been the sole breadwinner for the family and that after the offense, she and her children had to go on welfare. Therefore, the post-conviction court found that the Petitioner failed to prove that he was prejudiced by any alleged deficiency. The evidence does not preponderate against this finding.

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise the foregoing issue on direct appeal. The Petitioner failed to support this claim with any argument, waiving this claim. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## I. Enhancement and Mitigating Factors

The Petitioner contends that trial counsel and appellate counsel were ineffective by failing to challenge the trial court's application of enhancement and mitigating factors during sentencing. The Petitioner maintains that he submitted to the post-conviction court a list of the sentencing factors that trial counsel should have challenged. The Petitioner contends that certain enhancements should not have applied because they were elements of the offense of aggravated sexual battery. The post-conviction court found that "[t]rial counsel did not fail to challenge the application of enhancement factors and the non-application of mitigating factors." On appeal, the Petitioner does not specify the factors, make any further arguments, cite to the record, or cite any law in support of this issue. We conclude that this issue is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7); see also State v. Anthony Blackwell, No. M2016-01063-CCA-R3-CD, 2017 WL 2772688, at *13 (Tenn. Crim. App. at Nashville, June 26, 2017) (stating that simply incorporating by reference a prior argument without giving proper citations to the record or law or providing new argument fails to "comply with the basic rules of this court and to provide sufficient analysis" for this court to address the claim, resulting in waiver of the issue).

## J. Prosecutorial Misconduct

The Petitioner contends that trial counsel was ineffective by failing to object to multiple acts of prosecutorial misconduct. Specifically, he contends that trial counsel should have objected to the admission of the victim's blanket, on which were markings by the TBI crime laboratory, "which could be inferred as markers for existing DNA, which could convince the jury that the [Petitioner] either ejaculated on the blanket or that a rape took place."

In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758,

759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). The post-conviction court found no evidence in the record of prosecutorial misconduct. Therefore, the post-conviction court found that trial counsel was not deficient for failing to challenge any alleged prosecutorial misconduct. The record does not preponderate against this finding.

Moreover, we note that at the post-conviction hearing, trial counsel testified that he agreed to stipulate to the admissibility of the blanket because testing revealed that no DNA was present on the blanket; therefore, trial counsel thought that the blanket helped the Petitioner's case. This court has stated that, "[w]hen reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). The Petitioner is not entitled to relief on this issue.

On appeal, the Petitioner also complains that trial counsel should have objected to the State's use of the word "rape kit" while questioning Dr. Lakin, which he contends was an attempt to infer that a rape took place. However, the Petitioner did not raise this claim in the lower court. We will not address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995).

The Petitioner also summarily contends that appellate counsel was ineffective for failing to raise issues of prosecutorial misconduct on direct appeal. However, because the Petitioner failed to support this claim with any argument, this claim is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

K.  Grand Jury Foreperson

The Petitioner contends that trial counsel was ineffective by failing "to challenge the illegal selection process of the grand jury foreperson." This issue has been addressed by this court in numerous cases and found to be without merit. Nelson v. State, 499 S.W.2d 956, 956 (Tenn. Crim. App. 1972); David C. Duncan v. State, No. M2017-00277-CCA-R3-ECN, 2017 WL 3078178, at *3 (Tenn. Crim. App. at Nashville, July 19, 2017); State v. Antonio Crenshaw, No. W2014-01367-CCA-R3-CD, 2015 WL 2447717, at *14 (Tenn. Crim. App. at Jackson, May 22, 2015); State v. Anthony R. Aikens, No. E2006-00528-CCA-R3-CD, 2007 WL 1135492, at *7 (Tenn. Crim. App. at Knoxville, Apr. 16, 2007). The Petitioner is not entitled to relief on this issue.

## L.  Forensic Interview

The Petitioner contends that trial counsel was ineffective by failing "to object to the introduction of the video of the victim's forensic interview as substantive evidence or request that a limiting instruction be given to the jury." He also contends that appellate counsel was ineffective by failing to raise this issue on direct appeal. The Petitioner makes no further argument, gives no citations to the record, and cites no law in support of these contentions. These issues are waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

## M.  Sufficiency of the Evidence

The Petitioner raises as "an ineffective assistance of counsel claim[] and also a stand-alone claim" a challenge to the sufficiency of the evidence sustaining his conviction of aggravated sexual battery. Initially, we note that "[i]t has long been established that the sufficiency of the convicting evidence is not cognizable in a post-conviction proceeding." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Although the Petitioner maintains that he raises the issue as an ineffective assistance claim, he makes no arguments to support his claim regarding the ineffectiveness of counsel on this issue.

## N.  Brady Violation

As a stand-alone claim, the Petitioner contends on appeal that the State committed a violation of Brady v. Maryland, 373 U.S. 83 (1963), by withholding evidence from the Petitioner during the plea negotiation process. Specifically, the Petitioner contends that the State withheld the victim's blanket, nightgown, underwear, and the photographs of the victim's vagina. The Petitioner did not raise this as a stand-alone issue in the post-conviction court, thereby waiving the issue.

## O.  Cumulative Error

The Petitioner contends that the cumulative errors denied him the right to a fair trial. However, we have found no trial errors that individually or cumulatively warrant relief.

## III.  Conclusion

The judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE